AL FREEMAN AND GEORGE FREEMAN v.
STATE OF ARKANSAS

CR 73-50                                    496 S.W. 2d 378

Opinion delivered July 2, 1973

*J. H. Cottrell,* for appellants.

*Jim Guy Tucker,* Atty. Gen., by: *James W. Atkins,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. George and Al Freeman, brothers, were convicted by Desha County Circuit Court, sitting as a jury, of possessing burglar's tools[1], George Freeman being sentenced to serve ten years in the Arkansas Department of Correction, and Al Freeman being sentenced to serve six years. From the judgment so entered, appellants bring this appeal.

For reversal, it is first asserted that the "Court erred in not directing a verdict of acquittal when the State rested, by reason of a total absence of any testimony to show the tools introduced into evidence were adapted, designed, and commonly used or kept for purposes of breaking into stores, shops, offices or dwelling houses as charged in the information, or that they were more nearly suitable for use by burglars than for lawful purposes." Officer Elmer Wayne Hamilton of the Dumas Police Department testified that he was on duty, along with Officer Mose Harmon, around 1:30 A.M. on December 5, 1971; that he observed two black men walking on the side of the street on Choctaw, the men being in work clothes. As the car of the officers approached, the two men ran around the corner and one of them, Andrew Berry, not involved in the present case, got behind a butane tank. According to the officer, he observed Berry placing some tools behind the

---

[1]Ark. Stat. Ann. § 41-1006 (Repl. 1964):

"Possession or manufacture of burglar's tools.—Any person who makes, mends, designs or sets up, or who has in his custody or concealed about his person, any tool, false key, lockpick, bit, nippers, fuse, force screw, punch, drill, jimmy, bit, or any material, implement or other mechanical device whatsoever, adapted, designed or commonly used for breaking into any vault, safe, railroad car, boat, vessel, warehouse, store, shop, office, dwelling house, or door shutter, or window of a building of any kind, shall be guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than two (2) years, nor more than ten (10) years."

tank. Hamilton stated that a brace and bit were found behind the butane .tank. He testified that George Freeman had a hammer which was thrown into a yard and that Freeman dropped a crowbar; also, he was wearing a glove on one hand. The two were arrested and taken to the station where they were given a breathalizer test. Berry registered intoxication and he was also charged with indecent exposure.[2] Freeman was not charged at that time, and was taken back to his car where Al appeared to be asleep in the car. They were not immediately arrested and George got into the automobile and the Freemans proceeded to the station.[3] They were then arrested, and subsequently the present charge was filed against them. The testimony of Officer Mose Harmon, called by the defense, differed in some respects from that of Hamilton, principally in that Hamilton had stated that the tools were picked up by the officers as soon as they were dropped, while Harmon testified that they were not taken until after the two Freemans had been arrested.

The next morning, a search warrant was obtained and the car was searched. Another crowbar and a saw were found in the trunk, along with a Missouri license plate which had expired in October, 1971. Several pairs of gloves were found in the car.

George Freeman testified that he lived in St. Louis and at the present time, was on parole from the Federal penitentiary, having been on parole since 1967. He had been convicted of bank robbery in about 1956, and had also served time at Cummins for a period of sixty days, following his parole from the Federal institution; also, he had been convicted of armed robbery in Portland, Oregon in 1946. Freeman stated that he worked at Delmar Gardens, a nursing home, and that he was manager and general maintenance man, Delmar operating two homes, fifteen miles apart. This appellant stated that he did plumbing, fixed switches, carpentry work, painting, and other similar tasks as part of the job. In addition, he stated that he engaged in carpentry wherever he could find a job and that he had been engaged in paneling a house. He said

---

[2]Berry was observed "relieving himself" behind the butance tank.

[3]Subsequent testimony by the appellants was to the effect that they had gone back to try to obtain the release of Berry.

that at the time of the arrest, he was also employed by Kisco Company, working on an assembly line, "handling 150 millimeter shells"; that as an employee there, he received a pair of new gloves every night, in order not to injure the shells. One of this appellant's fingers had been amputated, and he said that he was wearing the glove over the bandage as protection. According to appellants, the trip to Arkansas was for the purpose of picking up luggage belonging to Al Freeman. This appellant, according to his testimony, was employed by the St. Louis Land Clearance Authority (similar to an Urban Renewal project), having been so employed for twelve years. He said that his salary was $9,247.00 per year, plus some overtime. Freeman testified that he and his wife were planning a trip to Michigan, but he discovered that he didn't have his luggage. According to the witness, the luggage was quite expensive, having a value of $587.00, and he said that he had loaned this luggage to his wife's brother, who lived at Eagle Mills, Arkansas. Al stated that he did not have enough cash to make a plane or bus trip to Eagle Mills so he asked George to loan him his automobile. The brother would not lend him the car, but said that he would take him down to Eagle Mills. George had Berry in the car to help drive, since the former's finger was causing him pain. The three left St. Louis about 11:00 A.M. on Saturday, the 4th. Al said that he drove for a while, but became drowsy and turned the wheel over to Berry; that they stopped in Poplar Bluff, Missouri to eat, and when they again started on the trip, he went to sleep. According to the witness, he was awakened near McGehee and George told him that a wrong turn had been made and they were going back to where the mistake had occurred. The three stopped at Dumas for food, and Berry, according to Al Freeman, wanted a drink. Berry and George Freeman went to get liquor for themselves and coffee for Al, and Al went back to sleep. He said that he was awakened by a police officer shining a light in his face.

Both appellants stated that they had never been to Eagle Mills, but George said that he had a good idea how to get there from directions given by Al's wife, and a map.[4] Berry was driving and was to follow Highway 65, and was to awaken George when they reached a certain place on 65 where they were to turn off.

---

[4]Eagle Mills is located in Ouachita County near Camden.

"He stayed on 65 instead of calling me at the place where he was suppose to turn and maybe he missed it and kept right on 65. As you know it is a turn there on 65, and then when I did wake up I saw a sign saying 'McGehee.' I know that we must be going the wrong way, it was 65 and we shouldn't have been on it. That's why we looked at the map and saw that we was out of the way and we turned around and was coming back to Pine Bluff and pick up 69 or 79 whichever. . ."

George denied that he had any tools in his possession while on the street in Dumas or that he had dropped any, and also denied that Berry had tools. He identified the brace and bit and said that it was in the trunk of his car. Freeman mentioned other tools which he stated were in the back which he used in his work, but which are not relied upon by the State in bringing the charge. He identified the saw as his property, as well as the gloves; George denied ownership of the hammer, stating that the hammer he owned was new. This appellant stated that his parole officer was aware of the fact that he had the tools and was familiar with the work he performed in using them.

George, in explaining why he and Berry were on the street, testified:

"When we got through eating we got ready to move off and pull down the street and we wanted to, the place was closed up, closing up, we was going to see if we couldn't get a couple of women I guess, so this is why we pulled down in front of this place where the music was and so they decided they wanted some coffee and something to drink to go along with it. We were not particular about the coffee, we wanted the alcohol, we was going to see if we could get some coffee because we thought there was a restaurant next to this grocery store and we go back to this liquor place to get this stuff and that's when the police stopped us."

Appellant, Al Freeman, said that he did not know tools were in the trunk of the car, though he was aware of his brother's occupation entailing maintenance. The witness said that his brother and Berry did not carry any

tools with them when they left the automobile. He stated that he did not know how to get to Eagle Mills, but his wife "told us to follow the bus route."

The court, in rendering judgment, commented as follows:

"It is awfully hard for the Court to believe three grown men of these mens' intelligence, they are apparently very intelligent men, with a road map in their hand would leave St. Louis going to Eagle Mills, Arkansas, and wind up in McGehee, Arkansas, and then turn around in McGehee and start back to Pine Bluff, Arkansas, to go to Eagle Mills when there are three or four ways you can go to Eagle Mills even from McGehee, Arkansas, if you are looking at a map. In addition to that I think you can drive all the way from St. Louis to, well, I know that you can get a lot further than McGehee by 1:30 at night, you can get a lot further than that if you are driving. In addition to that it is awfully difficult to believe that a person would drive from St. Louis, Missouri, to Eagle Mills to pick up a set of suitcases or a set of luggage."

In discussing the first point for reversal, we might refer to the case of *Prather* v. *State*, 191 Ark. 903, 88 S.W. 2d 851. There, we said:

"Therefore, should we follow the theory upon which this case is presented to us by appellant, that is to say, if the tools, devices, appliances, or materials were such as might be reasonably used on proper occasions by honest workmen in the prosecution of their respective vocations, then the statute would most probably be futile, so far as its enforcement is concerned. At least, courts and juries would be unable to convict any burglar or any man who might be indicted, unless there was found in the possession of such person some tool, manufactured for or used by burglars, and which would be unsuited for use otherwise. Such construction of this statute would be unwise and would tend to defeat its beneficent purpose in the protection of society against professional lawbreakers.

"Perhaps, no fixed rule or announcement should be

made as a criterion for guilt or innocence, *except that in every instance the matter under investigation should be determined as a matter of fact,* [our emphasis[5] controlled or explained by all of the conditions, circumstances, and such pertinent collateral matters as might be present."

While as far as George Freeman is concerned, the facts recited by the trial court, sitting as a jury, are logical and persuasive, along with the fact that it is not necessary to carry tools around at 1:30 in the morning in order to buy liquor or contact women, it is nonetheless necessary that the judgment as to George be reversed because of the fact that no evidence was offered to the effect that at least one of these "tools" was designed for or commonly used in committing burglary. See *Gossett* v. *State,* 242 Ark. 593, 414 S.W. 2d 631. In *Moore, Frazier and Davidson* v. *State, supra,* the sheriff testified that any one of the tools there found might be used in some ordinary, lawful, occupation. However, he also testified that such a combination of tools was adapted to, and commonly used for breaking and entering. In *Satterfield* v. *State,* 174 Ark. 733, 296 S.W. 63, the Chief of Police of Fort Smith, an expert on burglary tools, testified; in *Prather* v. *State, supra,* a police officer testified relative to the use of the tools. It must be remembered that the jury is the fact finder, and there probably are many jurors who are not familiar with possible uses of tools of this nature. While in the case before us, the court, sitting as a jury, tried the case, the same rules are applicable that relate to a jury trial.

As to Al Freeman, we find absolutely no evidence that sufficiently connects him with the tools involved.[6] This appellant was not with the other two while they were walking the streets and dropped the tools; according to the evidence, he did not own any of the tools. According to the officers, he was asleep in the car when discovered; he did not own the automobile in which the tools were being carried. In other words, the only fact that can

[5] This italicized phrase was also emphasized in quoting this paragraph in *Moore, Frazier and Davidson v. State,* 244 Ark. 1197, 429 S.W. 2d 122.

[6] In the second point for reversal, it was specifically contended that a verdict of acquittal should have been entered for Al Freeman because there was no evidence showing possession of the tools by him.

be established as to Al Freeman is that he was riding with the other two. The court recognized the weakness of the State's case against Al Freeman and made several remarks during the trial, such as, "The evidence is not anything except that Al Freeman was asleep in a car * * * I don't believe the Supreme Court will sustain you on that. Even if it was shown that he owned these tools it would be a little stronger case, * * * . You did not even show that he was in possession of them except that he was in the automobile." Apparently, the judgment entered by the court was based simply on the fact that Al Freeman was travelling with the other two. We are of the opinion, that under the evidence, or to state it more accurately, because of the lack of evidence, the court should have granted an acquittal to appellant Al Freeman.

In accordance with what has been said, the judgment of the Desha Circuit Court is reversed and the cause, as to George Freeman, is remanded for further proceedings. As to Al Freeman, the judgment is reversed and dismissed.

It is so ordered.

FOGLEMAN, J., dissents in part.

JOHN A. FOGLEMAN, Justice, dissenting. I would not dismiss the case as to Al Freeman. The undisputed testimony is that the mission on which the three appellants embarked was for Al Freeman's purposes. His professed ignorance of the presence of the tools in the automobile in which he was found is subject to some skepticism to say the least. The gloves were in the car, not the trunk. Al Freeman was wide awake when George Freeman and Berry departed on their mission, whether it was to find liquor or female companionship for themselves, coffee for Al or to commit a burglary. I cannot believe that they removed these tools from the car without Al Freeman's knowledge. Mysteriously enough, someone, presumably Al Freeman, had moved the vehicle three blocks from the place where George and Andrew Berry had left him, before the officers who arrested these two brought George back to find the vehicle, and someone had locked the car doors. One of the officers who went up to the automobile where Al Freeman was found recognized the possibility that Al was doing a good job of feigning sleep. A search

of the vehicle disclosed that tools other than those said to have been hurriedly discarded by George Freeman and Berry were in the trunk. These tools included a crowbar and a saw. George Freeman said that the brace and bit, which the officers claimed to have found elsewhere, was actually found in the trunk of his car. Al Freeman was arrested as an accessory. I cannot say that a reasonable mind could not conclude from this testimony that Al Freeman was at least an accessory to the crime. The judge sitting as a jury might well have believed from the evidence before him that Freeman was guilty of more than being caught in bad company. I certainly do not agree that we should conclude that the evidence which might be presented has been fully developed.